# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| MOAPA BAND OF PAIUTES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT, *et al.*, <br><br> Defendants. <br><br> and <br><br> NEVADA POWER COMPANY, <br><br> Intervenor-Defendant | Case No. 2:10-CV-02021-KJD-LRL <br><br> **ORDER** |

Before the Court is Plaintiffs Moapa Band of Paiutes and Sierra Club, Inc.'s Motion for Summary Judgement (#36). The Federal Defendants filed an Opposition and Cross-Motion for Summary Judgment (#41). Intervenor-Defendant Nevada Power Company ("NPC") also filed an Opposition and Cross-Motion for Summary Judgment (#42). Plaintiffs responded (#44) and the Federal Defendants and the Intervenor-Defendant replied (##45, 46). The Court rules on these motions together herein.

I. Background

In April of 2006, the Bureau of Land Management ("BLM") Las Vegas Field Office received an application from NPC requesting a right of way ("ROW") grant to construct, maintain, and operate new evaporation ponds and an expanded solid waste landfill (the Expansion) for the Reid Gardner Generating Facility in Clark County, Nevada. NPC is seeking to improve management of the wastewater evaporation process and provide adequate landfill space for byproducts of its operations including fly ash, bottom ash and solids from the evaporation ponds. The proposed Expansion would replace the facility's current evaporation ponds which sit in the flood plain of the Muddy River only a few feet about underground aquifers. It would also provide additional landfill space for ash.

The BLM sought public input as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et. seq.*, and held two public meetings for the purpose of determining environmental concerns. The BLM sent letters to stakeholders soliciting participation in these meetings. The BLM also invited the Nevada Division of Environmental Protection, Clark County Department of Air Quality and Environmental Management, the Bureau of Indian Affairs ("BIA"), and Southern Nevada Health District ("SNHD") to participate as cooperating agencies under NEPA.

In July of 2006, the BLM consulted with the Moapa Band of Paiutes and the Las Vegas Paiute Tribe pursuant to the National Historic Preservation Act. In August, 2006, BLM and NPC officials attended a Moapa Band of Paiutes Tribal Council meeting to discuss the Expansion. The Band (together with the Sierra Club "Plaintiffs") raised concerns over air quality and health issues and suggested various alternatives for evaluation. Plaintiffs also requested that BLM seek BIA's involvement in the NEPA process to ensure that the Band's interests would be adequately represented. In addition, Plaintiffs submitted a letter indicating the presence of desert tortoises and cultural resources within the proposed ROW. BLM officials consulted with Plaintiffs about an archaeological site that was not eligible for inclusion in the National Register of Historic Places ("NRHP") and BLM removed the area from the ROW.

In July 2007, the BLM provided notice for a 30-day public comment period for a draft of an Environmental Assessment ("EA") which examined impacts and alternatives to the Expansion. The BLM received six comments during this period. The finalized EA incorporated changes recommended by the BLM in response to the comments received during the public comments period.

On March 24, 2008 the BLM issued a Finding of No Significant Impact ("FONSI") and a Decision Record approving the Expansion. The ROW was issued on June 20, 2008. Plaintiffs filed suit in November 2010 challenging the ROW under the Federal Land Policy Management Act ("FLPMA") 43 U.S.C. §§ 1701 *et. seq.*, and NEPA.

II. Standard of Review

Summary judgment should be granted when the record evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

District courts review the actions of the BLM under the Administrative Procedure Act ("APA"). See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61 (U.S. 2004). "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010) (citations omitted). Instead, a court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency decisions are overturned:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1178 (9th Cir. 2011) (citations and quotations omitted). "The standard is deferential. The court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action. . . . The agency's action need

only be a reasonable, not the best or most reasonable, decision." River Runners, 593 F.3d at 1070 (citations, quotation marks, alterations omitted).

III. BLM Compliance With FLPMA

BLM manages public lands under its control in accordance with FLPMA, which states that BLM "shall manage the public lands under principles of multiple use and sustained yield . . . except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law." 43 U.S.C. § 1732(a). This multiple-use principle "breathe[s] discretion at every pore." Strickland v. Morton, 519 F.2d 467, 469 (9th Cir. 1975). Plaintiffs contend that BLM violated FLPMA by failing to comply with existing BLM policies and by failing to consider unnecessary and undue degradation.

    A. Error in Use of Outdated Manual

The APA instructs reviewing courts to take "due account ... of the rule of prejudicial error." 5 U.S.C. § 706. "If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." PDK Laboratories Inc. v. U.S. D.E.A., 362 F.3d 786, 799 (D.C. Cir. 2004) See also Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 659 (2007) (finding that an inaccurate Federal Register notice stating that Endangered Act Species Act consultation was "required" was harmless error when consultation had already occurred). In the Ninth Circuit, "consistent caselaw" has held that "harmless error" requires a determination that the error "had no bearing on the procedure used or the substance of [the] decision reached." Cal. Wilderness Coal. v. U.S. Dept. of Energy, 631 F.3d 1072, 1092 (9th Cir. 2011). See also Kazarian v. U.S. Citizenship and Immigration Servs., 596 F.3d 1115, 1122 (9th Cir. 2010) (harmless error where agency denied an application for a visa based on an erroneous interpretation of its own regulations, where under proper interpretation a denial still would have been appropriate).

Plaintiffs originally argued that, in granting the ROW, BLM violated its own policies prohibiting "permanent treatment, storage or disposal facilities for hazardous materials on public

4

lands," citing to BLM Manual 1703; 43 C.F.R. ¶ 2805.12(k); 43 C.F.R. ¶ 2807.20(b). Plaintiffs further contended that the waste material that would be stored on the ROW, including barium, chromium, and selenium, is defined as hazardous by BLM regulations. After BLM pointed out the version of Manual 1703 Plaintiffs cite is from 1995 and not the current version, Plaintiffs acknowledged that it is not binding on the agency.

However, according to Plaintiffs, the BLM itself relied on the 1995 version of Manual 1703 in granting of the ROW and determined that the waste in question was not hazardous. Plaintiffs argue that this "evidences a muddled decision-making process detached from any serious consideration of hazardous waste and the limits imposed on such waste by BLM rule and policy." (Plaintiffs' Response and Reply (#44) at 5.) According to Plaintiffs, this failure renders the decision of the BLM to grant the ROW arbitrary and capricious.

BLM contends that the error was harmless because the ROW is consistent with all applicable regulations at the time it was granted and BLM would have come to the same conclusion if it had relied on the current version of Manual 1703. BLM also argues that Plaintiffs' interpretation of BLM regulations as prohibiting permanent storage of hazardous waste is simply wrong and that the ROW includes terms and conditions allowing for disposal of hazardous materials.

The Court agrees with BLM's characterization of the use of the 1995 version of Manual 1703 as harmless error. Plaintiffs offer no argument that BLM would have reached a different conclusion had BLM used the most current version of Manual 1703 when it granted the ROW. Use of the 1995 manual had no bearing on the procedure or the substance of BLM's decision and, accordingly, is not a basis to vacate BLM's decision.

B. Current BLM Policy on Waste Storage

Plaintiffs also argue that BLM's current regulations do not permit permanent disposal of hazardous waste on public lands and that the ROW itself does not authorize permanent storage of hazardous materials. Neither of these claims has merit.

1    BLM's interpretation of the current version of Manual 1703 as permitting waste storage
2 consistent with the ROW is based on BLM's Federal Register notice accompanying the regulations.
3 See Rights-of-Way, Principles, and Procedures, 70 Fed. Reg. 20970, 21024 (April 22, 2005). BLM's
4 interpretations of its own regulations, even those advanced in a legal brief, are entitled to deference
5 "unless that interpretation is plainly erroneous or inconsistent with the regulation." Chase Bank v.
6 McCoy, 131 S. Ct. 871, 880 (2011) (quoting Auer v. Robbins, 519 U.S. 452, 117 (1997)); see also
7 League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 549 F.3d
8 1211, 1217–18 (9th Cir. 2008) (post-decisional memorandum interpreting regulation was controlling
9 unless plainly erroneous or inconsistent with the regulation). This interpretation is not plainly
10 erroneous. Accordingly, the Court accepts BLM's interpretation that its regulations permit the
11 permanent storage of waste consistent with a grant of ROW.
12    Finally, the Court agrees with BLM that the ROW includes terms and conditions allowing for
13 the disposal of hazardous materials. The Administrative Record demonstrates that the ROW grant
14 gives specific parameters for storage and disposal of fly ash on the ROW, requires the ROW holder
15 to comply with other laws relating to hazardous substances and solid waste, and requires NPC to
16 remediate hazardous substances on or emanating from the ROW. Accordingly, the Court finds that
17 the BLM complied with FLPMA and its own regulations in approving the Expansion and allowing
18 hazardous waste to be stored on the ROW.
19    C.  Unnecessary and Undue Degradation
20    FLPMA requires that BLM "take any action necessary to prevent unnecessary or undue
21 degradation of the [public] lands." 43 U.S.C. § 1732(b). Courts routinely uphold land management
22 actions that cause degradation of the public lands, so long as adequate measures are taken to
23 reasonably mitigate the level of degradation to be allowed. See, e.g., S. Fork Band Council of W.
24 Shoshone v. U.S. Dep't of Interior, 588 F.3d 718, 724–25 (9th Cir. 2009) (finding that BLM
25 adequately determined that unnecessary or undue degradation would not occur as a result of mining
26 projects despite finding that some facilities would fail to meet relevant visual impact standards);

6

Theodore Roosevelt Conservation Partnership v. Salazar, 744 F. Supp. 2d 151, 158–59 (D.D.C. 2010) (upholding BLM's finding that unnecessary or undue degradation would not occur where development activity was subject to monitoring and mitigation measures, including the concentration of development activity in already-impacted areas). BLM has broad discretion in determining how best to implement the prohibition on unnecessary or undue degradation. See Gardner v. BLM, 638 F.3d 1217, 1222 (9th Cir. 2011) (Section 1732(b) "leaves BLM a great deal of discretion in deciding how to achieve" its goal of preventing unnecessary and undue degradation "because it does not specify precisely how the BLM is to meet [its goal], other than by permitting the BLM to manage public lands by regulation or otherwise.") (citation omitted).

Plaintiffs argue that the BLM's statement in the FONSI that the project would not cause unnecessary and undue degradation was conclusory and is not substantiated by reasoned explanation in the record. According to Plaintiffs, BLM's lack of explanation and analysis makes the finding of no unnecessary and undue impact arbitrary and capricious.

The Court does not agree. While BLM could have been more explicit in identifying the support for its finding that no unnecessary or undue impact would occur, its finding was not arbitrary or capricious. An agency decision should be upheld "if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Bowman Transp. Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974)); see also Miller v. Lehman, 801 F.2d 492 (D.C. Cir. 1986) ("if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference"). BLM articulated the benefit that granting the ROW would provide for the expanding population of Southern Nevada. The record demonstrates that BLM required a variety of mitigation measures in the project plans to limit or prevent degradation of public land and the surrounding environment. The Court can reasonably discern the path by which BLM determined that no unnecessary or undue degradation would occur and defers to

BLM's determination. Accordingly, the Court finds that BLM complied with FLPMA in determining that there was no unnecessary or undue impact.

IV. Compliance with NEPA

NEPA is "our basic national charter for protection of the environment." Blue Mts. Biodiversity Project v. Blackwood, 161 F.3d 1208, 1215-1216 (9th Cir. 1998) (quoting 40 C.F.R § 1500.1(a)). "NEPA is a purely procedural statute, intended to protect the environment by fostering informed agency decision-making." Hapner v. Tidwell, 621 F.3d 1239, 1244 (9th Cir. 2010). NEPA does not dictate substantive results. Id. Rather, it sets forth "the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." Id. (quotation omitted). NEPA requires federal agencies to prepare an environmental impact statement ("EIS") before engaging in "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). However, prior to an EIS, an agency can prepare an EA to determine whether a significant impact necessitating an EIS exists. An EA is a "concise public document" that must "[b]riefly provide sufficient evidence and analysis" to determine if impacts from a proposed action will be significant or insignificant. If the action is deemed insignificant, the agency may issue a FONSI "briefly presenting the reasons why an action … will not have a significant effect on the human environment…." 40 C.F.R. § 1508.13; 40 C.F.R. § 1508.9.

Judicial review of the adequacy of an EA and an agency's decision not to prepare an EIS is governed by the APA's arbitrary and capricious standard. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1331 (9th Cir. 1992). This standard requires that courts ensure that the agency took a "hard look" at the environmental consequences of the proposed action, based its decision on a reasoned evaluation of all relevant factors, and sufficiently explained why the proposed action's impacts will be insignificant. See W. Watersheds Project v. Bureau of Land Mgmt.,774 F.Supp.2d 1089, 1094 (D. Nev. 2011). An EA need not be as detailed as an EIS and its preparation is less rigorous and formal. See, e.g., Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005) ("[A]n agency's obligation to consider alternatives under an EA is a lesser one than

under an EIS."). Thus, the "level of detail and depth of impact analysis" in an EA "should normally be limited to the minimum needed to determine whether there would be significant environmental effects." 43 C.F.R. § 46.310(e).

### A. Continued Operation of the Facility

NEPA requires agencies to analyze effects that bear a "reasonably close causal relationship" to the proposed action. Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004). The Supreme Court has interpreted this requirement to mean that an agency need not evaluate "effects" that the agency cannot prevent. Id. A "direct effect" is an effect that is "caused by the action and occur[s] at the same time and place." 40 C.F.R. § 1508.8(a) (NEPA regulations). An "indirect effect" is an effect that is "caused by the action" and is "later in time or farther removed in distance, but [is] still reasonably foreseeable." Id. § 1508.8(b). A "cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." Id. § 1508.7.

"An EIS is not required ... when the proposed federal action will effect no change in the status quo." Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116 (9th Cir. 1980) (holding that "[a]n EIS need not discuss the environmental effects of mere continued operation of a facility.") See, e.g., City & Cnty. of S.F. v. United States, 615 F.2d 498, 501 (9th Cir. 1980) (finding EIS adequate where Navy evaluated effects of shipyard lease only in comparison to the decades-long prior use of the facility as a shipyard, rather than "as if the Navy were proposing to establish this multi-million dollar industrial complex for the first time"); Upper Snake River Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 234-35 (9th Cir. 1990) (holding that agency need not prepare an EIS before adjusting water flow from a dam because continued operation of the dam would have consequences "no different than those in years past").

Plaintiffs argue that in preparing the EA, BLM should have applied the "hard look" analysis to the continued operation of the Reid Gardner Facility. According to Plaintiffs, since the Expansion

allows continued generation at the plant, the operations of the facility are a "direct or indirect effect" which must be considered in determining whether there is a significant impact. See 40 C.F.R. § 1508.8(a)-(b).

Contrary to the claims of Plaintiffs, the BLM did not analyze its decision to grant the ROW based on an assumption that the facility would shut down if the Expansion was not approved. Instead, in conducting the NEPA analysis, the BLM assumed continued operation of the facility while acknowledging the insufficiency of on-site landfill space and the location of evaporation ponds in the flood plain. Administrative Record ("AR") at 1127, 1310. BLM lacks the statutory authority to prevent continued operation of the facility and accordingly cannot be considered the cause of the continuation of the operations. See Pub. Citizen 541 U.S., at 770 ("We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."). In compliance with NEPA, BLM did consider the Existing Facility in the required cumulative impacts analysis. BLM made findings related to air quality, fugitive dust, hydrogen sulfide, and groundwater contamination. AR at 97 – 103. BLM explained its decision to limit further analysis by stating that "the evaporation ponds and ash landfill are replacements for existing facilities on NPC's private property and will not provide for enhanced or increased plant operations, i.e. increased generating capacity." AR at 1099.

The record shows that continued operation of the Reid Gardner facility is not dependant on action by the BLM and the Expansion would only maintain the status quo. Accordingly, NEPA does not require BLM to generate an EIS analyzing the impacts of continued operations of the facility. Goldschmidt, 623 F.2d at 116. BLM's cumulative analysis of continued operation of the facility was sufficient to satisfy NEPA.

B. Air Quality Impact

The record demonstrates that BLM's finding that the Expansion would have no significant impact on air quality was not "arbitrary, capricious, or an abuse of discretion." Greenpeace Action,

14 F.3d at 1331. BLM determined that "the Proposed Action would not cause the production of additional solid wastes, and the transport and handing of these materials under the Proposed Action would essentially be the same as for the existing operations." AR at 79. In so determining, BLM examined the Expansion's potential to increase fugitive dust and hydrogen sulfide emissions. AR at 79-80. BLM recognized that the project would temporarily increase emissions, and noted that the Expansion would move the evaporation ponds and landfills further from the Moapa community. AR at 276. BLM examined mitigation and monitoring measures. BLM did determine that if the ROW was granted, haul routes would be 40% longer. AR at 323. However, BLM found that the increase in actual haul distance–no more than a mile–would not create a significant impact. Although the area is a non-attainment area for ozone, the BLM properly determined that the standards for fugitive dust and hydrogen sulfide, fell within the range of National and State Ambient Air Quality Standards. AR at 100-101.

BLM also assumed in its determination that regulatory agencies charged with permit enforcement would ensure compliance with the permit requirements. This assumption is reasonable. See, e.g., Okanogan Highlands Alliance v. Williams,1999 WL 1029106, at *4 (D. Or. Jan. 12, 1999) (finding that the Forest Service could reasonably rely on the EPA and the Washington Department of Ecology "to administer and enforce regulatory requirements within their jurisdiction to protect the environment."). BLM complied with its obligations under NEPA in determining that the Expansion would have no significant impact on air quality.

    C.  Water  Quality Impact

BLM's analysis of the probable environmental impacts of the Expansion on water quality was sufficient to support its FONSI. The EA discussed the use of liners and secondary liners to prevent leakage from the evaporation ponds, regular compaction in the landfills, and testing procedures to ensure effectiveness. Based on this analysis of modern facility design, BLM concluded that the "design of [the evaporation pond and landfill] facilities is such that the impacts to surface water quality by leachate... are extremely unlikely." AR at 86. Plaintiffs point to problems with leakage

from the existing ponds which were built in the 1960's, but BLM has reasonably concluded that this has no bearing on the likelihood of leaks from the newly constructed ponds. BLM adequately took a "hard look" at the water quality issue and its findings that the design of the ponds were sufficient to ensure that there will be no impact were not arbitrary, capricious, or an abuse of discretion.

### D. Impact on Migratory Birds and Wildlife

BLM appropriately considered the impact on migratory and other birds. BLM determined that no significant impact would occur since the Expansion's evaporation ponds are replacing existing ponds. The new and old ponds will operate concurrently for only a brief period of time. AR at 81. Further, BLM noted that waterfoul and shore birds are rare in the area of the desert where the facility is located. BLM also properly analyzed the impact on the Gila monster habitat and NPC's protocol in the Plan of Development for dealing with encounters, including utilizing a trained biologist. AR at 84. BLM was "reasonably thorough" in its analysis of the impacts and satisfied the requirements of NEPA. See W. Watersheds Project, 552 F. Supp. 2d at 1128.

### E. Impact on Cultural Resources

BLM engaged the Far Western Anthropological Research Group, Inc. to preform an inventory of cultural resources affected by the grant of the ROW. None of the sites identified were eligible for inclusion on the National Register of Historic Places. BLM appropriately determined that cultural impact of the Expansion was not significant. The Nevada State Historic Preservation Office concurred with BLM's determination. BLM's findings were not arbitrary, capricious, or an abuse of discretion and comported with established processes for making determinations of this type. See 40 C.F.R. § 1508.27(b)(8) (significance determined by "[t]he degree to which the action may adversely affect . . . objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources."); Enos v. Marsh, 769 F.2d 1363, 1373–41 (9th Cir. 1985) (holding that "[t]he [Army] Corps' decision that the discovery or research potential of the cultural deposits was not of such significance so as to warrant EIS supplementation is reasonable" when the decision was approved by the State Historic

Preservation Council). BLM also acted appropriately in limiting its analysis to the Expansion, and not considering the broader impact of the continued operation of the facility. BLM was not arbitrary and capricious and complied with its obligations under NEPA in determining that there would be no significant impact on cultural resources.

## F. Evaluation of Mitigation Measures

"In evaluating the sufficiency of mitigation measures, we focus on whether the mitigation measures constitute an adequate buffer against the negative impacts that result from the authorized activity to render such impacts so minor as to not warrant an EIS." Wetlands Action Network v. U.S. Army Corps of Engineers, 222 F.3d 1105, 1121 (9th Cir. 2000). The discussion of effectiveness of mitigation measures does not need to be highly detailed. See Okanagon Highlands Alliance v. Williams, 236 F.3d 468, 474 (9th Cir. 2000) (sustaining a mitigation scheme in which each mitigation measure was rated "high," "moderate," or "low" for expected effectiveness).

The record shows that BLM considered numerous measures to mitigate the adverse environmental impacts of the proposed ROW. BLM evaluated planned measures to reduce emissions of fugitive dust such as watering roads, compacting landfill waste, and covering landfills with earth. AR at 33, 35, 309. BLM evaluated planned measures to use proven methods to properly ventilate the evaporation ponds to prevent buildup of harmful gasses. AR at 31, 33, 309. BLM required NPC to comply with plans for noxious weed control. AR at 34, 311, 312. The design of the ponds takes into account possible wildlife impact. AR at 34, 314. Tortoise-proof fencing is included in the NPC plans. AR at 35, 317. Measures for groundwater contamination prevention and monitoring were also considered by BLM. AR at 35, 313-4. BLM ensured that Nevada Department of Wildlife's suggestions for mitigation features were adopted in the plans. AR at 159.

BLM properly considered mitigation measures for the Expansion and determined that they were adequate to render the impacts insignificant enough to forego an EIS. BLM's evaluation of the impact measures was reasonable and satisfied the requirements of NEPA.

### G. Decision not to Prepare an EIS

To comply with NEPA, an agency determining the need to prepare an EIS must consider both the context and intensity of the proposed actions. 40 C.F.R. § 1508.27. To determine intensity, the agency should examine "ten NEPA factors." W. Watersheds Project, 2011 WL 1195803, at *5 (referring to the ten factors listed at 40 C.F.R. § 1508.27(b)). "An agency's decision not to prepare an EIS once that agency has prepared an EA is reviewed for abuse of discretion, and will be set aside only if it is 'arbitrary and capricious.'" Kern v. BLM, 284 F.3d 1062, 1070 (9th Cir. 2002) (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 376-77 (1989)); see also Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir. 1974) ("The preparation of such a statement necessarily calls for judgment, and that judgment is the agency's.").

The intensity factors are:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

BLM appropriately considered all of the above factors. Specifically, the first three factors were considered when the BLM took a hard look at the impacts of the Expansion. BLM properly did not consider the existing operations as an effect of the Expansion, as discussed *supra*. BLM considered the degree to which public health and safety would be affected and recognized that, although there would be impact, the degree of the impact was minimal compared to existing operations. AR at 79, 276. BLM also considered the effects on cultural resources and, working in conjunction with state agencies, determined that no significant impact would occur.

The BLM analyzed the fourth and fifth factors properly. The Ninth Circuit has deemed a federal action "controversial if a substantial dispute exists as to [its] size, nature, or effect." Greenpeace Action, 14 F.3d at 1333 (internal quotation and emphasis omitted, alteration in original). Plaintiffs point to an Administrative Order on Consent relating to the current evaporation ponds and landfill as evidence that a substantial dispute exists. However, the Administrative Order on Consent addresses issues with the 1960's era landfill and evaporation ponds. It does not demonstrate that a substantial dispute exists about the Expansion, especially in light of the finding that the modern designs and new location do not pose a risk of groundwater contamination. The risks of the Expansion are not unknown since the Expansion replaces outdated existing facilities.

The sixth and seventh factors have been previously addressed. Approval of the Expansion did not determine whether the facility would continue to operate. Accordingly, the BLM only analyzed this factor in the FONSI with respect to future ROW grants. It reasonably determined that, since such grants are handled on a case by case basis, there was little risk of problematic precedent. Similarly, BLM appropriately considered the cumulative impacts of the Expansion including the operation of the existing plant and proposed residential development.

The eighth factor, as previously discussed, was addressed when BLM determined that no impact to places eligible for listing on the National Register of Historical Places would result from grant of the ROW.

BLM properly addressed the ninth factor in its analysis of adverse affects on the desert tortoise, the only Endangered Species Act species in the area. BLM reasonably determined that grant of the ROW is not likely to jeopardize the continued existence of the desert tortoise and ensured appropriate mitigation measurers. AR at 215, 277.

Finally, the tenth factor was appropriately examined by the BLM. BLM determined that the area was in attainment for the air quality factors of concern to Plaintiffs–hydrogen sulfide and fugitive dust. BLM ensured that the project complied with the Administrative Order on Consent relating to the existing facilities. AR at 2869-2927. Finally, BLM required NPC to obtain all necessary state and local permits to ensure compliance with state and local laws. AR at 309, 313-14.

Accordingly, BLM properly determined that an EIS was not necessary based on the ten NEPA factors. BLM's conclusion was not arbitrary or capricious and the Court declines to set it aside.

### H.  No-Action Alternative

BLM must consider "alternatives to the proposed action" and "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E). BLM must "[r]igorously explore and objectively evaluate all reasonable alternatives" and must "[i]nclude the alternative of no action." 40 C.F.R. §§ 1502.14(a), (d). "The existence of reasonable but unexamined alternatives renders a [NEPA analysis] inadequate." Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1065 (9th Cir. 1998) (citation omitted). However, parties who wish to challenge particular issues connected to an agency's NEPA analyses have an obligation "to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council Inc., 435 U.S. 519, 553 (1978); See also Havasupai Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir. 1991) (finding that when the tribe's views were solicited during

the comment process and the tribe failed to raise groundwater issues, it could not raise the issue as "a basis for reversal of an agency decision" later).

The record shows that BLM specifically identified the no-action alternative and solicited participation from Plaintiffs. BLM discussed the no-action alternative, compared the impacts of the no-action alternative with the proposed action, and determined that the impacts of the no-action alternative would be greater. AR at 36, 80-81. Plaintiffs did not raise the issue of BLM's analysis of the no-action alternative during the public comment period of the draft EA or the scoping period. Plaintiffs argue that examination of the no-action alternative is an issue "so obvious" that it need not be raised by those making comments for the agency to be alerted to it. Public Citizen, 541 U.S. at 765.

The requirement to examine the no-action alternative is obvious. However, since BLM did preform analysis of the no-action alternative, Plaintiffs must notify the agency of specific criticism of the analysis itself. See Great Basin Mine Watch v. Hankins, 456 F.3d 955, 967 (9th Cir. 2006) (plaintiffs did not exhaust their claims regarding a failure to protect federally-reserved water rights when the plaintiffs only made general comments about groundwater, springs, and seeps). Plaintiffs' complaint is that the no-action alternative should have been evaluated in more detail. Plaintiffs did not raise the issue of the degree to which the BLM addressed the no-action alternative in the comments to the EA or in the scoping period, despite ample opportunity to do so. See League of Wilderness Defenders-Blue Mountain Biodiversity Project v. Bosworth, 383 F.Supp.2d 1285, 1296–97 (D. Or. 2005) ("When the argument is one of degree, rather than an outright failure to address, the plaintiff must raise that argument during the comment period or be precluded from litigating it at a later date.") Accordingly, Plaintiffs have waived this claim.

Further, the record shows that BLM's analysis was adequate and that its conclusions were not arbitrary or capricious. The BLM determined that under the no-action alternative there would be a thirty-fold increase in vehicle emissions, similar levels of fugitive dust and hydrogen sulfide emissions, continued operation of the evaporation ponds in the Muddy River flood plain, and other

negative impacts. AR at 80-92. This analysis was sufficient to provide the analysis required under NEPA.

I. Supplemental EA

NEPA imposes on federal agencies an ongoing duty to issue supplemental environmental analyses. See Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp., 113 F.3d 1505, 1509 (9th Cir. 1997). Federal agencies have a duty to supplement an EA when: (1) "there remains 'major Federal action' to occur;" and (2) "the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." See Or. Natural Res. Council, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)). An agency's decision not to prepare supplemental NEPA analysis may be overturned only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See Idaho Sporting Cong. Inc. v. Alexander, 222 F.3d 562, 566 n. 2 (9th Cir. 2000).

Plaintiffs contend that BLM must supplement the EA based on the following issues: (1) need for additional waste capacity based on facility plans, (2) potential change in ozone standards, (3) ongoing state permitting processes, (4) groundwater contamination from the old ponds and landfill being replaced, (5) economic feasibility of trucking waste, (6) climate change, and (7) proposed coal ash regulations.

BLM granted the ROW in June 2008. BLM did not supplement its EA because it determined that no major federal action was left to occur when it was notified of the above issue by Plaintiffs in May and October 2010. BLM retains authority to suspend the ROW for noncompliance or modify the conditions of the grant based on legislative, regulatory, or other changes. However, Plaintiffs did not allege that noncompliance or other changes occurred. Mere authority to modify the terms of the ROW does not constitute major federal action yet to occur. See Cold Mountain v. Garber, 375 F.3d 884, 894 (9th Cir. 2004) (holding that no major federal action was left to occur despite allegations that the Forest Service had authority to enforce a special use permit but had failed to do so); Greater Yellowstone Coal. v. Tidwell, 572 F.3d 1115, 1123 (10th Cir. 2009) (holding that supplementation

under NEPA was not required after special use permit was issued where the agency could amend the permit at its discretion, because discretion to amend the permit, in the absence of any action to do so, was not major federal action).

Plaintiffs also contend that BLM still had to issue a notice to proceed in order for NPC to being the Expansion. BLM' issuance of the notice to proceed does not constitute major federal action yet to occur because it is not discretionary. The ROW provides that "upon receipt of permits, proof of payment of desert tortoise mitigation fees, and an approved written communication plan, a notice to proceed will be issued." AR at 308.[1] Because BLM lacked discretion to issue the notice to proceed, no major federal action remained. See, e.g., Ctr. for Biological Diversity v. Salazar, 2011 WL 2117607 at *8 (D. Ariz. 2011) (holding that BLM's requirement that mine operator secure a clean air act permit and updated reclamation bond before resuming operation was a monitoring activity and not major federal action as such); S. Utah Wilderness Alliance v. Office of Surface Mining Reclam. & Enforc., 2008 WL 4912058 at *12 (D. Utah 2008) aff'd 620 F.3d 1227 (10th Cir. 2010) (holding that "issuing Notices to Proceed is not 'major federal action' that would require supplemental NEPA"). Accordingly, BLM's decision not to supplement the EA was not arbitrary, capricious, or unreasonable.

//
//
//
//
//
//
//
//

---

[1] Other right-of-way holders, not BLM, were responsible for reviewing the communication plan.

V. Conclusion

The Court has found that BLM's actions were not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and accordingly, will not overturn BLM's actions under the APA. 5 U.S.C. § 706(2)(A).

Accordingly, **IT IS HEREBY ORDERED THAT** Plaintiffs' Motion for Summary Judgment (#36) is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Federal Defendants Cross-Motion for Summary Judgment (#41) is **GRANTED**.

**IT IS FURTHER ORDERED THAT** Intervenor-Defendant Nevada Power Company's Cross-Motion for Summary Judgment (#42) is **GRANTED**.

DATED this 6th day of October 2011.

_____
Kent J. Dawson
United States District Judge